**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**LUFKIN DIVISION**

|  |  |  |
|---|---|---|
| Grantley Patent Holdings, Ltd., | ) | |
| (a Texas Limited Partnership), | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 9:06cv259 |
| | ) | **JUDGE RON CLARK** |
| v. | ) | |
| | ) | |
| Clear Channel Communications, Inc.; | ) | |
| Clear Channel Management Services, LP | ) | |
| (d/b/a LAN International); | ) | |
| Ackerley Broadcasting Fresno, Inc.; | ) | |
| Ackerley Broadcasting Operations, LLC; | ) | |
| AMFM Broadcasting, Inc.; | ) | |
| Capstar Radio Operating Company; | ) | |
| Citicasters Co.; | ) | |
| Clear Channel Broadcasting, Inc.; | ) | |
| Jacor Broadcasting Corporation; and | ) | |
| Jacor Broadcasting of Colorado, Inc. | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S POST-TRIAL MOTION AND BRIEF IN SUPPORT FOR
ENTRY OF JUDGMENT INCLUDING ENHANCED DAMAGES,
INTEREST, ATTORNEY FEES, EXPENSES AND COSTS**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

SUMMARY OF NATURE AND STAGE OF PROCEEDINGS ................................. 1

ARGUMENT ..................................................................................................... 2

I.  The Court Should Treble the Jury's Award In Light of the Overwhelming Evidence of Willfulness and The Defendants' Size .............................................................. 2

    A.  Defendants Knew of the Patents and Did Not Have a Good Faith Belief that the Grantley Patents Were Invalid or Not-Infringed ......................................... 4

        1)  The Highest Level Executives of Defendants Knew About the Patents ..... 4

        2)  Defendants Knowingly Infringed the Patents ........................................... 6

    B.  Defendants Copied Mr. Fox's Inventions ................................................... 8

    C.  Defendants' Vexatious Litigation Strategy Supports Enhancing Damages ......... 11

    D.  Defendants' Gross Revenues and Large Size Permits an Award of Enhanced Damages ................................................................................................ 13

    E.  Infringement, Willfulness and Validity Were Not Close Questions .................... 14

    F.  Defendants Have Been Engaged in Infringing Activity For Years ...................... 16

    G.  Defendants Have Not Engaged in Any Remedial Action to Avoid Infringement of the Grantley Patents .......................................................................... 17

    H.  Defendants Were Motivated to Drive the Inventor's Company Out of the Market by Stealing His Ideas ............................................................................. 18

    I.  Defendants Attempted to Conceal Their Misconduct ..................................... 19

II.  An Award of Prejudgment Interest and Costs is Appropriate and Necessary Under 35 U.S.C. § 284 .................................................................................................. 20

    A.  The Prime Rate is the Appropriate Rate of Interest in this Case ...................... 22

III.  Grantley Should Be Granted Attorney Fees Pursuant to 35 U.S.C. § 285 ................. 23

i

IV.     The Law Also Mandates Post-judgment Interest..............................................................25

V.      Grantley Is Entitled to and Should Be Awarded A Reasonable Royalty for Ongoing
        Infringement..........................................................................................................................26

CONCLUSION..........................................................................................................................26

80078027.1

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Acoustical Design, Inc. v. Control Elecs. Co.,*
    932 F.2d 939 (Fed. Cir. 2001)................................................................. 3

*Adv. Med. Optics, Inc. v. Alcon Labs, Inc.,*
    No. Civ.A. 03-1095-KAF, 2005 WL 3454283 (D. Del. Dec. 16, 2005) .......... 24

*Amsted Indus., Inc. v. Buckeye Steel Castings Co.,*
    24 F.3d 178 (Fed. Cir. 1994)................................................................ 25

*Applera Corp. v. MJ Research Inc.,*
    372 F.Supp.2d 233 (D. Conn. 2005)..................................................... 13

*Aro Mfg. Co. v. Convertible Top Replacement Co.,*
    377 U.S. 476 (1964)............................................................................ 3

*Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc.,*
    853 F.2d 1557 (Fed. Cir. 1988)........................................................... 24

*Beckman Instruments, Inc. v. LKB Produkter AB,*
    892 F.2d 1547 (Fed. Cir. 1989)........................................................... 24

*Del Mar Avionics, Inc. v. Quinton Instrument Co.,*
    836 F.2d 1320 (Fed. Cir. 1987)...................................................... 17, 24

*Domestic Fabrics Corp. v. Sears, Roebuck & Co.,*
    326 F. Supp. 2d 694 (E.D.N.C. 2004).................................................. 13

*Dowling v. United States,*
    473 U.S. 207 (1985)............................................................................ 3

*Engineered Prods. Co. v. Donaldson Co.,*
    147 Fed. Appx. 979 (Fed. Cir. 2005).................................................... 3

*Fuchs v. Lifetime Doors, Inc.,*
    939 F.2d 1275 (5th Cir. 1991) ........................................................... 26

*General Motors v. Devex Corp.,*
    461 U.S. 648 (1983)........................................................................... 21

*Golight v. Wal-mart Stores, Inc.,*
    355 F.3d 1327 (Fed. Cir. 2004)........................................................... 24

iii

*IMX, Inc. v. Lendingtree, LLC,*
   469 F. Supp. 2d 203 (D. Del. 2007)......................................................................... 22

*In re Seagate Tech., LLC,*
   497 F.3d 1360 (Fed. Cir. 2007)............................................................................ 2, 3

*Jurgens v. CBK, Ltd.,*
   80 F.3d 1566 (Fed. Cir. 1996)................................................................................. 3

*Kaufman Co. v. Lantech, Inc.,*
   807 F.2d 970 (Fed. Cir. 1986)................................................................................ 17

*Kloster Speedsteel AB v. Crucible Inc.,*
   793 F.2d 1565 (Fed. Cir. 1986).............................................................................. 24

*Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.,*
   383 F.3d 1337 (Fed. Cir. 2004).............................................................................. 13

*Lam, Inc. v. Johns-Manville Corp.,*
   718 F.2d 1056 (Fed. Cir. 1983).............................................................................. 22

*Liquid Dynamics Corp. v. Vaughan Co.,*
   449 F.3d 1209 (Fed. Cir. 2006)............................................................................... 3

*Mars, Inc. v. Conlux USA Corp.,*
   818 F.Supp. 707 (D. Del. 1993), *aff'd* 16 F.3d 421 (Fed. Cir. 1993) ................ 23

*Nickson Indus., Inc. v. Rol Mfg. Co.,*
   847 F.2d 795 (Fed. Cir. 1998)................................................................................ 21

*Oiness v. Walgreen Co.,*
   88 F.3d 1025 (Fed. Cir. 1996)................................................................................ 21

*Olsen v. Teledyne Movable Offshore,*
   708 F.2d 976 (5th Cir. 1983) ................................................................................. 26

*Read Corp. v. Portec, Inc.,*
   970 F.2d 816 (Fed. Cir. 1992)................................................................... 2, 3, 4, 13, 25

*Rite-Hite Corp. v. Kelly Co., Inc.,*
   56 F.3d 1538 (Fed. Cir. 1995)................................................................................ 22

*Rohm & Haas Co. v. Crystal Chem. Co.,*
   736 F.2d 688 (Fed. Cir. 1984)................................................................................ 24

*S.C. Johnson & Son, Inc. v. Carter-Wallace, Inc.,*
   781 F.2d 198 (Fed. Cir. 1986)........................................................................... 24, 25

iv

*SEB S.A. v. Montgomery Ward & Co.,*
    No. 99 Civ. 9284, 2007 WL 3165783 (S.D.N.Y. Oct. 9, 2007) ...................................... 24

*Sensonics, Inc. v. Aerosonic Corp.,*
    81 F.3d 1566 (Fed. Cir. 1996)................................................................................ 21

*Smith v. Alyeska Pipeline Serv. Co.,*
    538 F.Supp. 977 (D. Del. 1982), *aff'd* 758 F.2d 668 (Fed. Cir. 1985) ................................ 3

*SRI Int'l, Inc. v. Adv. Tech. Labs., Inc.,*
    127 F.3d 1462 (Fed. Cir. 1997)................................................................................ 2

*St. Regis Paper Co. v. Winchester Carton Corp.,*
    410 F.Supp. 1304 (D. Mass. 1976) ......................................................................... 14

*Stickle v. Heublein, Inc.,*
    716 F.2d 1550 (Fed. Cir. 1983)............................................................................... 21

*Tivo Inc., v. EchoStar Commc'ns Corp.,*
    2:04-CV-1-DF, 2006 U.S. Dist. LEXIS 64293 (E.D. Tex. Aug. 17, 2006),
    *damages aff'd* 516 F.3d 1290 (Fed. Cir. 2008)................................................................ 22

*Uniroyal, Inc. v. Rudkins-Wiley Corp.,*
    939 F.2d 1540 (Fed. Cir. 1991)............................................................................... 22

*z4 Techs., Inc. v. Microsoft Corp.,*
    No. 6:06-CV-142, 2006 WL 2401099 (E.D. Tex. Aug. 18, 2006)............................ 14, 22

**Statutes**

28 U.S.C. § 1961 ................................................................................................. 26, 27

35 U.S.C. § 284.................................................................................... 2, 20, 21, 22, 27, 2

35 U.S.C. § 285................................................................................................. 23, 24, 27

Local Rule CV-54 ..................................................................................................... 22

80078027.1

## INTRODUCTION

When a company with $6.8 billion in annual revenue generates internal e-mails acknowledging it will infringe a patent once it goes beyond a pilot program, and then repeatedly testifies at trial through multiple, high level officers and employees that it never even considered doing anything to avoid the patent, and when it conceals what it is doing with the inventor's information under false pretenses, then it is appropriate to enhance damages to the fullest extent under the law. A maximum enhancement is even more appropriate when the willful infringer makes reckless and irresponsible charges in the litigation that the inventor or his attorney, whom the Defendant never deposed, engaged in multiple acts of inequitable conduct. In light of the degree of willfulness, the extraordinary financial strength of the infringer and the need to punish and deter, this Court should treble the jury's verdict and enter judgment for total damages in the amount of $198,089,250. The Court should further award prejudgment interest at the prime rate in the amount of $12,858,166, attorney fees, expenses and costs in the amount of $4,682,112, and post-judgment interest on the total award pursuant to 28 U.S.C. §1961.

## SUMMARY OF NATURE AND STAGE OF PROCEEDINGS

On April 22, 2008, after a seven day trial, the jury reached a unanimous verdict on all claims in favor of Grantley. Specifically, the jury found that defendants Clear Channel Communications, Inc.; Clear Channel Management Services, LP (d/b/a LAN International); Ackerley Broadcasting Fresno, Inc.; Ackerley Broadcasting Operations, LLC; AMFM Broadcasting, Inc.; Capstar Radio Operating Company; Citicasters Co.; Clear Channel Broadcasting, Inc.; Jacor Broadcasting Corporation; and Jacor Broadcasting of Colorado, Inc. (collectively "Defendants" or "Clear Channel") infringed all of the asserted claims of United States Patents Nos. 6,061,691 ("'691), 6,253,187 ("'187"), 6,567,824 ("'824") and 6,920,464

("'464") (collectively the "Grantley Patents" or "Fox Patents").   The jury further found Defendants' infringement of the Grantley patents was willful. The jury upheld the validity of the Grantley Patents and awarded Grantley damages through March 31, 2008, in the amount of $66,029,750. Prior to the jury verdict, the Court granted judgment as a matter of law in favor of Grantley on Defendants' defenses of laches, equitable estoppel, and inadequate written description. Grantley was previously granted summary judgment on Defendants' defense of inequitable conduct. Defendants withdrew their enablement defense during trial.

## ARGUMENT

I.   **The Court Should Treble the Jury's Award In Light of the Overwhelming Evidence of Willfulness and the Defendants' Size.**

The jury was instructed that it could find that Clear Channel acted willfully only if Grantley proved by clear and convincing evidence that Clear Channel acted objectively recklessly, and had no reasonable or good faith basis to believe it would not infringe valid patents after being aware of the patents. *See* Tr. at 1712-14. The jury found that Grantley met this exacting burden of proof required by *In re Seagate Tech., LLC*, 497 F.3d 1360 (Fed. Cir. 2007).   The jury awarded damages of $66,029,750 as a reasonable royalty for Clear Channel's past infringement. However, the underlying facts in evidence justify a tripling of these damages. The record at trial is replete with evidence of Clear Channel's willful disregard for the patent owner's rights.   Such "wanton disregard of the patentee's patent rights" clearly supports awarding enhanced damages. *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826 (Fed. Cir. 1992).

The Patent Act grants courts the authority to "increase the damages up to three times the amount found or assessed." 35 U.S.C. § 284. The principal considerations in enhancement of damages are the same as those of the willfulness determination, but "in greater nuance as may affect the degree of enhancement." *SRI Int'l, Inc. v. Adv. Tech. Labs., Inc.*, 127 F.3d 1462, 1469 (Fed. Cir. 1997).   A Court should look at the totality of the circumstances in determining to what extent the damages should be increased. *See, e.g., Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1573

(Fed. Cir. 1996); *Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1225 (Fed. Cir. 2006). However, it is well-established that a finding of willful infringement provides ample justification for an award of treble damages. *See, e.g., Acoustical Design, Inc. v. Control Elecs. Co.*, 932 F.2d 939, 942 (Fed. Cir. 2001) (affirming award of treble damages based on willful infringement finding); *Engineered Prods. Co. v. Donaldson Co.*, 147 Fed. Appx. 979, 991-92 (Fed. Cir. 2005) (same); *Smith v. Alyeska Pipeline Serv. Co.*, 538 F.Supp. 977, 986 (D. Del. 1982), *aff'd* 758 F.2d 668 (Fed. Cir. 1985) ("patent owner is entitled to treble damages in a patent infringement action where the defendant has knowingly, deliberately, intentionally, willfully, or wantonly infringed the patent"); *Seagate*, 497 F.3d at 1381 (J. Gajarsa concurring) (citing *Dowling v. United States*, 473 U.S. 207, 227 (1985) and *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 508 (1964) as standing for "uncontroversial proposition that a finding of willfulness is sufficient to support an award of enhanced damages"). Although the amount of an enhancement is discretionary, the Federal Circuit has found an abuse of discretion when a district court failed to enhance damages after a finding of willfulness. *See Jurgens,* 80 F.3d at 1573 (holding that the district court abused its discretion by failing to enhance damages or award attorneys' fees in light of the jury's findings of willful and bad faith infringement).

The Federal Circuit has set forth nine factors to "assist the trial court in evaluating the degree of the infringer's culpability and in determining whether to exercise its discretion to award enhanced damages and how much the damages should be increased." *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 828 (Fed. Cir. 1992). The *Read* factors are:

(a)      whether the infringers, when they knew of another's patent protection, investigated the scope of the patents and formed a good faith belief that they were invalid or that they were not infringed;

(b)      whether the infringers deliberately copied the ideas or design of another;

(c)      the infringers' behavior as parties to the litigation;

(d)      defendants' size and financial condition

(e)      closeness of the case

(f)     duration of defendants' misconduct;

(g)     remedial action by defendants

(h)     defendants' motivation for harm; and

(i)     whether defendants attempted to conceal their misconduct.

*Id.* at 827. As explained below, consideration of the *Read* factor demonstrates that Defendants' conduct warrants the maximum allowable increase in damages. Indeed, it is hard to imagine another case with more compelling evidence of a knowing, deliberate, willful and wanton infringement of a patent.

### A.     *Defendants Knew of the Patents and Did Not Have a Good Faith Belief that the Grantley Patents Were Invalid or Not-Infringed*

#### 1)     The Highest Level Executives of Defendants Knew About the Patents

Knowledge and wanton disregard for the patents permeated the highest management levels of the Clear Channel enterprise. It started around July 1998, when Mr. Fox sent a letter to Geoff Armstrong, Chief Financial Officer of Defendant Capstar, with a memo that disclosed that he was seeking patents on some of the ideas he shared with Capstar and its consultant from Arthur Andersen. *See* Tr. at 310-11 & PX186 (Ex. I). The same letter was sent to Capstar's Chairman of the Board, Steve Hicks, and President John Cullen. PX186 (Ex. I). But Defendants offered no evidence that any of these three senior managers did anything to ensure non-infringement or concern for the patentee's rights. It was the opposite. Mr. Armstrong actually misrepresented to Mr. Fox that the Capstar "Galaxy Project" did not involve a yield management component. PX186 (Ex. I). Mr. Cullen, who received a copy of the letter and thereby knew that Mr. Fox had been misled, actually went on to sponsor further development of the infringing system. *See* Tr. at 623-24; 839-42; 909.

Mr. Fox and Mr. Tiller again put Defendants on notice of the patents after the '691 patent issued in 2000. Exhibit DX 62 established that Clear Channel employees, including David

Murray, and their consultants from Ernst & Young, including Nick Cory, discussed the recently issued '691 patent at a meeting in June 2000. DX62 (Ex. O) at CC208997 ("Maxagrid has just received a patent for their algorithms"); Tr. at 902-3; *see also* Tr. at 155. But the knowledge about the patent did not stop there. Mr. Fox also met with Clear Channel's *Chief Information Officer* David Wilson in mid-2000 and personally discussed the patent and related pending applications. Tr. at 316-18. In fact, Mr. Wilson conceded that, after talking with Mr. Fox, he was "uncomfortable from a business standpoint" because he knew "we had this patent to deal with." Tr. at 823.

Messrs. Cullen, Armstrong, Hicks, Murray, Cory and Wilson were not the only persons with knowledge of the patents. On April 30, 2001, Maxagrid's counsel sent a letter to Ken Wyker, Senior Vice President of Legal Affairs, about the '691 Patent and other pending applications, and he invited resumed discussions with Maxagrid so that Clear Channel would avoid infringement of the "patent portfolio." Tr. at 162-66 & PX111 (Ex. P). Mr. Tiller also forwarded the same letter to Mark Mays, Senior Vice President – Operations for Clear Channel. *Id.* Neither of these high level executives responded to the letter. Knowledge of the patent and potential infringement went even higher in the enterprise - to John Hogan, Chief Executive Officer of Clear Channel Radio. Mr. Hogan received an e-mail in November 2001 from Allan Ginsburg advising that, "to avoid any conflict of patent infringement, I have not looked at Maxagrid." *See* Tr. at 651 & PX110 (Ex. Q). Mr. Ginsburg had the responsibility for developing Tradewinds/Viero. His e-mail eliminates any dispute that he intentionally disregarded the patent, and he did so with the knowledge of Mr. Hogan.

This knowledge cannot be limited to the '691 patent. As shown above, Maxagrid's counsel and Mr. Tiller advised Messrs. Wyker and Mays about the "patent portfolio" and invited

further discussion. Mr. Ginsburg's testimony, as well as Mr. Murray's emails, also confirmed that Clear Channel was aware of more than just one of the Grantley patents. *See* Tr. at 1007 ("Were you aware, when you worked at Clear Channel, about the Maxagrid patents? A. Yes."); PX65 (Ex. V) ("after reviewing the latest Fox Patents"); *see also* PX64 (Ex. W).

  2) <u>Defendants Knowingly Infringed the Patents</u>

The evidence completely removes any doubt that Clear Channel's  infringement was knowing.  Indeed, Defendants' own documents establish that, after receiving advice of counsel, they thought they would infringe if they commercialized "Tradewinds," which was later called "BestRate," a part of "VIERO." Mr. Murray wrote to Mr. Ginsburg:

> When I asked the attorney the question if we were infringing he said no because TW/MC [Tradewinds/MyChannel] is a pilot.  If a field system is replaced would that change our definition to production.  If so I would think Maxagrid would come after us if we start replacing there [sic] systems.

PX13 (Ex. X). Nonetheless, Clear Channel's development leaders and managerial executives wantonly disregarded Grantley's patent rights.  They went beyond their pilot program and employed a system in the field, knowing full well that they were infringing. Even after he wrote the memo quoted above, and having full knowledge from counsel that they could not take their system into production without infringing, Mr. Murray summed up Clear Channel's complete disregard for the patent with this amazing testimony:

> Q. You didn't do anything to try to design around, did you?
> A. No, sir.
> Q. You just went ahead and kept doing what you were doing, right?
> A. The product was already designed.
> Q. Okay. And you weren't about to stop it or pull it off the market because of a patent, were you?
> A. *That was not even a discussion.*

Tr. at 634 (emphasis added).

The deliberate and wanton infringement continued from 2003 through the course of this lawsuit.  In December 2006, Mr. Murray wrote that he reviewed "the latest Fox Patents."  He then confirmed his belief that the revenue projection patent looked exactly like the system he had been implementing, when he wrote "the damn thing looks like I wrote it."  PX65 (Ex. V).  His boss, Sharon Blankenship, replied "don't fret ... its just bidness [business]."  PX215 (Ex. CC).  This belief, that infringement of a patent was just a cost of doing business, was further confirmed when Mr. Murray testified:

> Q.  So, you saw the patent. You read it, and you wrote the memo [PX65].
> A.  Uh-huh.
> Q.  And you kept on doing what you were doing before, correct?
> A.  Yeah.  I carried about my business as I always do.
> Q.  Oh – well, did you make some changes to –
> A.  No.
> Q.  – avoid the patent?
> A.  No. ...

Tr. at 636; PX65 (Ex V).

Mr. Wilson, who knew "we had this patent to deal with," showed similar contempt in forging ahead with Tradewinds/VIERO:

> Q.  And based upon information and analysis that was done within Clear Channel, did anyone see the need to change the direction of the development of the Tradewinds product?
> A.  No need for change, no, sir.

Tr. at 824-25.

At trial, Defendants attempted to establish that they believed they would not infringe the '691 patent because VIERO does not use "reservations" or operate in "real-time".  *See, e.g.*, Tr. at 1157, 1201.  But, Mr. Murray admitted on cross-examination, that none of the *asserted* claims of the '691 patent even mention "reservations" or "real-time."  Tr. at 1165.  Additionally, this argument could not provide any good faith basis for believing the *other three* patents-in-suit were not infringed.  Moreover, Clear Channel's attempt to read a "reservations" or "real-time"

requirement into asserted patent claims was flatly rejected during the *Markman* phase of this case. *See* Docket No. 91 (Claim Construction Order) at 11-15. Even after these arguments were rejected, Defendants did not make any plans to change their system to avoid infringement, *see* Tr. at 660, 671, further illustrating their bad faith. Indeed, the testimony about "reservations" and "real time" was just an after-the-fact excuse, because Defendants knew full well that they would infringe once they moved from a pilot to actual use in the field. PX13 (Ex. X).

In conclusion, the evidence establishes that the patents were known by the development leaders and senior managers at Clear Channel, all the way up to CEO John Hogan. They knew they would infringe if they went beyond a pilot program. But, infringement did not matter. It was "just bidness."

### B.   Defendants Copied Mr. Fox's Inventions

The record is rife with evidence of Clear Channel's bad faith actions in mining Mr. Fox for information about his inventions, and then secretly copying and implementing those inventions after shutting off communications with him.

In late 1997-early 1998, Capstar and Andersen sought information from Mr. Fox and Maxagrid regarding yield and inventory management systems, as evidenced in part by Capstar and Andersen's entry of "one-way" non-disclosure agreements with Maxagrid. *See* Tr. at 297-302 & PX179, PX180 & PX181 (Exhibits C, D, E hereto). The agreements were "one-way" in that only Maxagrid and Mr. Fox were providing confidential information. Capstar and Andersen were described only as recipients of the confidential information. *Id.* Mr. Fox testified that he spent months educating Arthur Andersen and that he provided Capstar and Andersen "a lot of proprietary confidential information, not only about yield management but about larger, more broad-based ideas. Some of those included some of the concepts in the patents." Tr. at 306; *see also* PX182 (Ex. F); PX184 (Ex. G); PX186 (Ex. I). As discussed previously, Mr. Fox tried to

speak with and sent letters to John Cullen, Steve Hicks and Geoff Armstrong at Capstar because it appeared that the relationship was going downhill. *See* Tr. at 306-13 & PX184 (Ex. G), PX185 (Ex. H), PX186 (Ex. I). Mr. Armstrong misrepresented that Capstar's "Galaxy Project" did not involve yield management. PX186 (Ex. I). This was confirmed in correspondence by Mr. Fox to all three of those Capstar executives. *Id.* The evidence established that Mr. Fox's ideas regarding an integrated yield management system were actually incorporated in Galaxy. DX 49 (Ex J.); Tr. at 312-16. This included using demand-based pricing and eliminating humans from the pricing process because, even with their experience and intuition, humans "do not react fast enough." *Id.* These are concepts from the patent. '691 patent (PX1 [Ex. R]), at Col. 5, ll. 22-28; Cols. 7 – 8; Fig. 2 – 5.

Of course, Capstar subsequently became the target of several mergers/buy-out activities in the late 1990s and eventually became part of the Clear Channel enterprise. *See, e.g.*, Tr. at 135, 879.[1] Mr. Cullen became an executive with Clear Channel after the Capstar acquisition, and he led the resumption of Project Galaxy in 2000. *See* Tr. at 623-24 (Mr. Murray testified that VIERO, the infringing system, evolved from the Galaxy project led by Mr. Cullen); 839-42 (Mr. Wilson's testimony regarding Mr. Cullen sponsoring the Clear Channel project to build VIERO); 909 (Mr. Cory's testimony that "John Cullen was the person who was responsible –

---

[1] Jacor was another broadcasting group that was bought by and came under the umbrella of Clear Channel in approximately 1999. John Hogan the current CEO of Clear Channel Radio came from Jacor. *See* Tr. at 649-50. When Mr. Hogan was with Jacor in approximately 1999, he also was a customer of Maxagrid, and in fact Maxagrid designed and built for him at that time a revenue projection system that involved some of the ideas included in the patent. *See* Tr. at 137-45 & PX104, PX105, PX106 & PX107 (Exhibits K, L, M, N hereto). Thus, the Clear Channel Defendants gained information about Mr. Fox's inventions not only through their Capstar acquisition (involving Mr. Cullen and Project Galaxy, etc.) but also through Mr. Hogan and their Jacor predecessors. Related entities Jacor Broadcasting Corporation and Jacor Broadcasting of Colorado, Inc. are also named Defendants in this litigation.

ultimately responsible for the Galaxy project."); *see also* Tr. at 666 (Mr. Wilson also confirmed Anderson was involved in Galaxy); DX62 (Ex. O).

Mr. Fox personally disclosed to Mr. Wilson "that the patents concerned a fully integrated system. It was discussed with Mr. Wilson that we had multi-station capability and also that there were revenue projection capabilities. Tr. at 317. Mr. Wilson told Mr. Fox that Clear Channel "certainly [was] going to consider using" the patent. Tr. at 318. Mr. Wilson also told Mr. Tiller about Clear Channel's desire to build an integrated system as described in the patents:

> And [Mr. Wilson] said, "We would bring our stations and our resources, our 1200 stations or 1100" -- however many it was -- "our resources. And you would bring everything you-all had, your applications, your intellectual properties, your patents. You would bring all of that into a system, and we would build the system. ..."

Tr. at 159 (Mr. Tiller's testimony regarding meeting and conversation with Clear Channel executives including Mr. Wilson). Mr. Wilson also testified that at that time (mid-2000), the patent became "a focus of some analysis by Clear Channel." Tr. at 824.

Thus, the record shows that in mid-2000 Clear Channel had and intended to use Mr. Fox's patent as a blueprint in building an integrated enterprise inventory management system. However, Clear Channel subsequently cut off all communications with Fox and Tiller, and would not tell them whether their plans still included following the patents or something else. *See, e.g.*, Tr. at 162 ("Q. Even after all this where, I mean, it looks like it's coming to a halt, did you still try to contact Wilson and Hogan and Mays? A. Yes, sir. Q. Would they talk to you? A. No, they wouldn't."). But the trial record is clear that Defendants did indeed proceed ahead with their plans to build an integrated inventory management system, while ignoring Plaintiff's patent rights. *See, e.g.*, Tr. at 825 ("[W]e began to move down developing our own [integrated inventory management system], you know, in the late summer or early fall [of 2000]"); Tr. at

1017 & 1020 (Mr. Ginsburg testified that Clear Channel's goal during his tenure there was to integrate traffic billing and yield management, and that he was not concerned about Mr. Fox's patents about an overall integrated system because he personally was only working on a portion of the integrated system for Clear Channel).

### C.    *Defendants' Vexatious Litigation Strategy Supports Enhancing Damages*

Defendants engaged in vexatious and improper litigation tactics throughout the course of this litigation.   Defendants' improper conduct included repeatedly trying to limit or delay appropriate discovery, which at one point even resulted in sanctions against Defendants. *See* Docket Nos. 45, 50 (Plaintiff's motion for sanctions and Order granting motion in part). Defendants were not forthcoming with pertinent information despite very clear local rules to produce all documents relevant to any claim or defense.   For example, Defendants never disclosed they owned RCS Pro-Rate in response to pertinent interrogatories, even though they intended to rely on this system as prior art. *See* Tr. at 781-82; Plaintiff's Interrogatories Nos. 1, 2 (Ex. Y hereto) & Defendants' responses (Ex. Z). Thus, Defendants deprived Grantley of an opportunity to obtain more discovery about this art directly through Clear Channel.   As another example, Defendants did not produce relevant documents regarding parts of the accused system, such as the Radio Enterprise Data Mart (REDM), until after they were mentioned in a deposition and Plaintiff subsequently demanded full disclosure.    *See* Docket No. 45 at page 6 ¶ 14. Grantley was required to file a motion to obtain the source code for REDM, the most important part of the code that passes data between the traffic and billing system and the yield management system. *Id.*

When it came to disclosing information regarding their invalidity defenses, Defendants tried to use the "phone book" approach, listing numerous vague alleged prior art references but

failing to timely produce supporting documentation or chart specific contentions as required by the local rules. *See* Docket Nos. 150 & 175 (Plaintiff's motion for and order granting part of motion to exclude certain alleged prior art due to Defendants' failure to timely produce documents or chart contentions); *see also* Docket Nos. 146 (Plaintiff's motion to limit testimony of Defense expert Mr. Cole including excluding testimony regarding alleged prior art that was not appropriately identified or explained in Mr. Cole's expert reports, which was sustained in part at Docket No. 175); 177 (Order sustaining Plaintiff's objections to several of Defendants' proposed trial exhibits that represented improperly disclosed prior art).

Defendants also maintained unsupported claims all the way through trial, apparently with no intention of ever legitimately pursuing these claims. This included enablement, which Defendants dropped only at the close of the trial. Tr. at 1446. It also included a written description defense. That defense was stricken from the case because Defendants offered no evidence other than a bare, unsupported single statement of opinion by one expert witness. Tr. at 1662-63. Yet, they forced Grantley to expend time and resources to prepare a defense to these claims.

Likewise, Defendants asserted a spurious inequitable conduct claim. They accused Mr. Fox and/or his attorney, whom they never even deposed, of concealing art, with deceptive intent, that was *expressly referenced in the patent specification*. They further claimed that Mr. Fox concealed, with bad intent, that Fred Mueller was a co-inventor of the patents-in-suit. They made this reckless allegation *without even taking any testimony from Mr. Mueller* to learn the true facts. These inequitable conduct allegations were recklessly made without any concern for the truth, or for the work they would impose upon the Court, Grantley or Mr. Fox. *See* Docket

Nos. 97 & 172 (Plaintiff's motion for and Court Order granting summary judgment of no inequitable conduct).

Defense counsel also engaged in questionable litigation tactics at trial, including an improper and unfair impeachment. Tr. at 529-31; *see also* Tr. at 533. Defendants also chose to maintain privilege and not produce any opinion of counsel, yet then tried to introduce evidence regarding such opinion at trial although it was precluded by Local Patent Rule 3-7. *See* Tr. at 1152-56 & L.P.R. 3-7.

### D. Defendants' Gross Revenues and Large Size Permits an Award of Enhanced Damages

Defendants' extreme size, gross revenues and profits necessitate a substantial enhancement of the verdict. *See Read*, 970 F.2d at 827. Clear Channel's revenues exceeded $6.8 billion in 2007. *See* Clear Channel 10-K for 2007 (excerpts attached as Ex. AA hereto). As such, Clear Channel will not be deterred from future willful infringement absent a significant enhancement of damages. *See, e.g., Domestic Fabrics Corp. v. Sears, Roebuck & Co.*, 326 F. Supp. 2d 694, 702 (E.D.N.C. 2004) (trebling damages after finding willful infringement because to "punish a company of the size and financial greatness of Sears requires a significant enhancement of damages"); *Applera Corp. v. MJ Research Inc.*, 372 F.Supp.2d 233, 240, 247, 248 (D. Conn. 2005) (awarding damages of $35 million, double the jury award, due to need to punish willful conduct and "deter similar behavior, and to promote appropriate regard for patent rights" even though defendants argued any enhanced damages would represent "corporate death sentence" because total profitability during 10 year infringement period was $45 million); *see also Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337, 1342 (Fed. Cir. 2004) ("intentional disregard of legal rights warrants deterrence").

In contrast, Grantley is a small company that prevailed against the largest player in the

broadcasting sector.   The relative size difference between the two companies supports the enhancement of damages. *See St. Regis Paper Co. v. Winchester Carton Corp.*, 410 F.Supp. 1304, 1309 (D. Mass. 1976) (treble damages appropriate if "defendant were the giant and plaintiff the small independent"); *z4 Techs., Inc. v. Microsoft Corp.*, No. 6:06-CV-142, 2006 WL 2401099, *26 (E.D. Tex. Aug. 18, 2006) (enhancing damages where circumstantial evidence indicated that defendant Microsoft viewed plaintiff's patents rights as insignificant because small plaintiff would be unlikely to pursue its rights against large company or viewed plaintiff as "small and irrelevant company" "not worthy of Microsoft's time and attention, even if Microsoft was potentially infringing").

In view of the willful infringement and other conduct of Defendants, and Defendants' revenues that exceed $6.8 billion per year, treble damages in the amount of $198,089,250 would be appropriate to punish and deter Clear Channel from future misconduct.

### E.     *Infringement, Willfulness and Validity Were Not Close Questions*

The jury found every one of the 32 asserted claims infringed and valid, and as discussed above, the record was rife with evidence that Defendants deliberately copied Mr. Fox's invention and willfully used their infringing VIERO system with full knowledge that they were infringing. The questions of infringement, validity, and willfulness were not even close, as reflected in the jury's finding that Defendants' actions were objectively reckless.

Defendants asserted only three very weak non-infringement positions, none of which applied to all patents-in-suit.   Tr. at 1413.   Defendants' first non-infringement argument, regarding claims 14 and 15 of the '691 patent and the frequency of recalculation, was based on the improper reading-in of a "real time" updating requirement that appears nowhere in the patent

text.  This assertion is belied not only by the plain language of the claim, but by Defendants' expert, who agreed that the '691 patent has no real time limitation.  Tr. at 1414-15.

Defendants' second non-infringement argument relied on the erroneous and baseless position that all parts of the system for accessing inventory information of multiple stations must operate only at the precise time that the salesperson is entering customer request criteria in the user interface.  However, Defendants never sought a claim construction to this effect, and even if they had, the specification of the patents in suit demonstrates that requiring any such restriction is untenable, as it would exclude disclosed embodiments of the invention.  *See* '691 patent (Ex. R) col. 13 l. 53 - col. 14 l. 14.  The unambiguous facts, including Mr. Cole's admissions, established that the VIERO system as implemented and used by Defendants includes a system for accessing inventory information of multiple stations in response to a customer request.  Tr. at 1398; Tr. at 485-86.

Finally, Defendants' third non-infringement position was equally unsupported.  Through a contorted reading of the claim language they took the nonsensical position that the VIERO traffic billing system does not "maintain scheduling, processing, and accounting information" merely because humans are involved *somewhere* in the use of the system.  Tr. at 1403.  This illogical argument defies common sense and cannot withstand a plain reading of this element, which sets forth precisely what the system, *i.e.*, the computer, does:  maintains data files of scheduling, processing, and accounting information.  *See, e.g.*, '464 patent (Ex. U), claim 8. This clear language includes nothing that would require robots or artificial intelligence to enter initial information and operate the system.  Furthermore, Mr. Cole admitted that the VIERO traffic billing computer stores scheduling information. Tr. at  1423-24.  Defendants had no reasonable belief of non-infringement of any of the claims-in-suit.

In addition, the record demonstrates that Defendants did not put forth a meritorious good faith challenge to the validity of the Grantley Patents.  Defendants asserted three anticipatory references—Aeronomics, IRS, and Digital Insert—none of which, as the record reveals, was actually an integrated inventory management system, as opposed to merely some component similar to (or actually less relevant than) prior art that was disclosed to the Patent and Trademark Office.  *See, e.g.*, Tr. at 985, 1035, 1596-97, 1612, 1613-14, 1618-19.  Defendants' "Aeronomics" prior art was not even a clearly identified reference meeting any single category of prior art standard under 35 U.S.C. § 102, but rather a weak attempt to bootstrap information about foreign systems that are indisputably not prior art.   Defendants did not put in the record even a single prior art patent to support their invalidity argument. Nor did Defendants assert any prior art publication was anticipatory. *See* Tr. at 1429. Defendants' expert offered an opinion of obviousness, but on cross-examination admitted that he was not aware of the *Graham v. Deere* factors to be used in considering obviousness,[2] and had not done any analysis of secondary considerations.  Tr. at 1467-69.   As Grantley's expert's testimony confirmed, the asserted references clearly failed to anticipate the claims-in-suit or render them obvious, and several secondary considerations supported the non-obviousness of the inventions. *See generally* Tr. at 1589-98, 1611-54.

## F.   *Defendants Have Been Engaged in Infringing Activity For Years*

The record reflects that Defendants began infringing the Grantley Patents in approximately early 2003. *See, e.g.*, Tr. at 624-26.  Currently, Defendants' VIERO system has been infringing for at least five years, further supporting a trebling of damages.  Defendants' disregard for Grantley's legitimate patent rights, and Defendants continued use of the VIERO

---

[2] *See Graham v. John Deere Co. of Kansas City*, 383 U.S. 1 (1966).

system support a trebling of the awarded damages. *See Del Mar Avionics, Inc. v. Quinton Instrument Co.*, 836 F.2d 1320, 1328-29 (Fed. Cir. 1987) (affirming award of enhanced damages where infringement continued after the filing of the suit); *Kaufman Co. v. Lantech, Inc.*, 807 F.2d 970, 979 (Fed. Cir. 1986) (affirming award of enhanced damages where the infringer continued to sell the infringing product for four months after patent issued and the suit was filed).

### G. *Defendants Have Not Engaged in Any Remedial Action to Avoid Infringement of the Grantley Patents*

Defendants did not take any remedial action to avoid the activities covered by the Grantley Patents. Rather, the evidence supports that they deliberately copied the patented inventions and their knowledge of the patents led to no change in their plans for or use of the VIERO system. *See* Sections A & B above.

Mr. Wilson clearly testified that after looking at the first patent in 2000-2001, Clear Channel took absolutely no action to design around or avoid infringing the patent. Tr. at 665. As Mr. Murray testified on behalf of all defendants, changing the system because of the Grantley patents was "not even a discussion." Tr. at 634. Mr. Hogan also testified after the filing of the lawsuit and the *Markman* ruling that even then Clear Channel was not planning to make any changes to VIERO to avoid infringement. Tr. at 660 ("Q. ... Is Clear Channel currently in the process of making any design changes in order to avoid the ... patents that are involved in this lawsuit? A. Not that I'm aware of. ... I'm not aware of any changes that are contemplated with respect to patent infringement."); *see also* Tr. at 671 (Wilson testimony that he was unaware of any action being taken after the Claim Construction Order to change the system). Clear Channel's Inside Radio newsletter from April 24, 2008 demonstrates that even after the jury verdict Clear Channel unapologetically continues to use the infringing VIERO system. *See*

Exhibit BB hereto ("[T]here were simply no grounds to find an infringement of these patents. ... The suit is not expected to have an impact on station's software.").

### H.    Defendants Were Motivated to Drive the Inventor's Company Out of the Market by Stealing His Ideas

The record is clear that Defendants sought out Mr. Fox's ideas for improving yield management through an integrated inventory management system, but then shut Mr. Fox and his companies out of its plans to implement the system and forced all the Clear Channel radio stations that had contracts with Maxagrid for yield management systems to cancel or not renew those contracts. *See* Sections A & B above; *see also* Tr. at 1007 (Testimony of Mr. Ginsburg: "Q. Do you deny that you were attempting to replace the Maxagrid products ...? A. ... [I]t wasn't by personal goal to replace it. ... Q. Wasn't it the goal of your superiors, then? A. ... I imagine."); Tr. at 163 (it became very evident to Mr. Tiller that Clear Channel intended to have all their stations cancel or not renew any Maxagrid licenses and had no intention of further working with them as station personnel had been told to not be seen with Mr. Tiller or Maxagrid). Clear Channel's disrespect for Mr. Fox's and his companies' legal rights was evident, including willingness to improperly use confidential information obtained from them. *E.g., cf.* Tr. at 667-70 (Clear Channel understood it was not to use confidential information obtained from Mr. Fox and Maxagrid under a non-disclosure agreement); *with* Tr. at 900-01 (Ernst & Young—Clear Channel's consultants—obtained a copy of a confidential questionnaire document from Maxagrid that detailed how to configure a yield management system to work for a radio station) & DX62 (Ex. O) at CC308997 ("David believes that the value is the ability to mine the existing data generated from Maxagrid and manipulate it as necessary.").

Contrary to what they first led Mr. Fox and his companies to believe as they sought information from him, Clear Channel's goal was not to work with Maxagrid or Grantley and

license either their products or patents, but rather to forge ahead with their own secret development plans regardless of the Grantley patents. *See* Sections A & B above; *see also* PX13 (Ex. X) (Maxagrid licenses were viewed as "an unnecessary expense").

### I.     *Defendants Attempted to Conceal Their Misconduct*

Defendants for years mislead and concealed their plans and actions.  As laid out in PX186, Capstar principals told Mr. Fox they were not planning to build an integrated inventory management system, but were only working on a M.I.S. application (a traffic application with no inventory or yield management component) in their Project Galaxy.  Tr. at 306-10 & PX 186 (Ex. I).  Of course, this was not true.  A Project Galaxy document provided to Mr. Fox by one of his Capstar station clients, indicated that Project Galaxy was intended to be a complete inventory management system of the type described by Mr. Fox to Capstar and Andersen.  Tr. at 311-16 & DX49 (Ex. J).

Capstar was subsequently part of a number of station groups bought by or brought under the Clear Channel umbrella, *see, e.g.*, Tr. at 136-37, and in 2000 after the flurry of merger and buy-out activities, Clear Channel re-visited the Galaxy project in approximately 2000.  *See, e.g.*, Tr. at 903; DX62 (Ex. O).  Clear Channel again approached Mr. Fox and Maxagrid for ideas and information, but after obtaining a copy of their patent Defendants subsequently shut off communications with Mr. Fox about their plans.  *See* sections A & B above. Clear Channel would not tell Grantley about their plans or whether their plans still included following the patents.  *See, e.g.*, Tr. at 162 ("Q. Even after all this where, I mean, it looks like it's coming to a halt, did you still try to contact Wilson and Hogan and Mays? A. Yes, sir. Q. Would they talk to you? A. No, they wouldn't."); Tr. at 241-42 (Mr. Tiller and Grantley did not know what Clear Channel was doing because Defendants had cut off communications); *see also* Tr. at 163 (Clear

Channel station personnel were told not to talk to or be seen with representatives of Maxagrid);

Tr. at 320-21 (Grantley could not get information about the nature of Clear Channel's *internal*

system until after April 2005 when Clear Channel started advertising and publicly marketing

VIERO).

In light of Defendants' misconduct, and all the other factors discussed above, the jury's

verdict in the amount of $66,029,750 should be trebled, and judgment for total damages be

entered in the amount of $198,089,250.[3]  Maximum enhancement is necessary to punish and

deter wealthy corporations who consider infringement as "just bidness."  If the verdict is not

enhanced substantially, then there will be no incentive to avoid infringement because the worst

case outcome for an intentional infringer would be a business risk in possibly having to pay a

reasonable royalty, i.e. the amount it would have agreed to if it were willing to license from the

beginning.

**II.     An Award of Prejudgment Interest and Costs is Appropriate and Necessary Under 35 U.S.C. § 284.**

Grantley is entitled to prejudgment interest under the patent statute, which provides:

> Upon finding for the claimant the court shall award the claimant damages
> adequate to compensate for the infringement, but in no event less than a
> reasonably royalty for the use made of the invention by the infringer, together
> with *interest* and costs as fixed by the court.

35 U.S.C. § 284 (emphasis added).  The United States Supreme Court has made it clear that, to

fulfill the statutory mandate, plaintiffs such as Grantley who win patent infringement suits are

entitled to prejudgment interest:

> In the typical case an award of prejudgment interest is necessary to ensure that the
> patent owner is placed in as good a position as he would be in had the infringer

---

[3] If the Court is not inclined to treble the award, Grantley requests that the Court enhance the jury's verdict in an amount that it deems appropriate in light of the evidence and the *Read* factors.

> entered into a reasonable royalty agreement.  An award of interest from the time
> that the royalty payments would have been received merely serves to make the
> patent owner whole, since his damages consist not only of the value of the royalty
> payments but also of the forgone use of the money between the time of
> infringement and the date of judgment.

*General Motors v. Devex Corp.*, 461 U.S. 648, 655-56 (1983).  In *General Motors*, the Court explained that awarding prejudgment interest served § 284's underlying purpose by "afford[ing] the plaintiff full compensation for the infringement" and that prejudgment interest "should be awarded absent some justification for withholding such an award." *Id.* at 657.

In following the statutory and Supreme Court directive, the Federal Circuit has held that "[p]rejudgment interest is typically included as part of the patentee's recovery to insure compliance with the statutory mandate of 35 U.S.C. § 284 that damages be 'adequate to compensate for the infringement.'" *Stickle v. Heublein, Inc.*, 716 F.2d 1550, 1564 (Fed. Cir. 1983) (citing *General Motors*); *see also Oiness v. Walgreen Co.*, 88 F.3d 1025, 1033 (Fed. Cir. 1996) ("Interest compensates the patent owner for the use of its money between the date of injury and the date of judgment."). Indeed, the Federal Circuit has recognized that the award of prejudgment interest is "the rule, not the exception, and that "prejudgment interest in patent cases is withheld only under exceptional circumstances." *Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1574 (Fed. Cir. 1996).  In this case, there is no basis to deny an award of prejudgment interest.  Prejudgment interest is necessary to make Grantley whole as required by § 284 and to compensate Grantley for the loss of the use of its money from the date of infringement to the date of judgment. *Nickson Indus., Inc. v. Rol Mfg. Co.*, 847 F.2d 795, 800 (Fed. Cir. 1998) (interest should be awarded from the date of infringement to the date of final judgment).

Grantley is also entitled to costs under the statute. 35 U.S.C. § 284 ("the court shall award the claimant damages ... together with interest *and costs*") (emphasis added); *see also* Local Rule CV-54 (outlining procedure for submitting bill of costs after entry of judgment).[4]

## A.   *The Prime Rate is the Appropriate Rate of Interest in this Case*

Grantley requests prejudgment interest at the prime rate compounded quarterly, the market rate for bank lending. Trial courts are afforded wide latitude in selecting interest rates and "may award interest at or above the prime rate," *Uniroyal, Inc. v. Rudkins-Wiley Corp.*, 939 F.2d 1540, 1545 (Fed. Cir. 1991) (citations omitted), and "[i]t has been recognized that an award of compound rather than simple interest assures the patent owner is fully compensated." *Rite-Hite Corp. v. Kelly Co., Inc.*, 56 F.3d 1538, 1555 (Fed. Cir. 1995) (quotation omitted).

The prime rate has been recognized as an appropriate rate for prejudgment interest in patent infringement cases. *See, e.g., Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056 (Fed. Cir. 1983) (affirming a rate above the prime rate for award of prejudgment interest to compensate for delay in payment of damages); *z4 Techs., Inc. v. Microsoft Corp.*, No. 6:06-CV-142, 2006 WL 2401099, *27 (E.D. Tex. Aug. 18, 2006) (prejudgment interest awarded at prime rate compounded monthly/daily); *Tivo Inc., v. EchoStar Commc'ns Corp.*, 2:04-CV-1-DF, 2006 U.S. Dist. LEXIS 64293, at *22 (E.D. Tex. Aug. 17, 2006) (awarding prejudgment interest at prime rate), *damages aff'd* 516 F.3d 1290, 1312 (Fed. Cir. 2008); *IMX, Inc. v. Lendingtree, LLC*, 469 F. Supp. 2d 203, 227-28 (D. Del. 2007) ("Courts have recognized that the prime rate best compensates a patentee for lost revenues during the period of infringement ...."). The prime rate represents the "cost of borrowing money—and not the rate of return on investing money—[thus]

---

[4] Grantley is also moving for attorney fees and expenses, and has provided detailed information about its costs, fees and expenses. *See* section III below and Declaration of Ronald J. Schutz in support of the Motion for Entry of Judgment filed herewith.

provid[ing] a better measure" of the harm a patentee suffers as a result of the loss of the use of money over time. *Mars, Inc. v. Conlux USA Corp.*, 818 F.Supp. 707, 720-21 (D. Del. 1993), *aff'd* 16 F.3d 421 (Fed. Cir. 1993).

Because the jury found the Grantley Patents infringed and valid, Grantley is entitled to prejudgment interest from the date of first infringement through the date of final judgment. With respect to prejudgment interest, the prime interest rate, compounded quarterly, is appropriate to make Grantley whole for Clear Channel's infringement. Grantley's damages expert, Mr. Nawrocki, has performed interest calculations using the prime interest rate, compounded quarterly, running from July 1, 2003,[5] through June 3, 2008. *See* Nawrocki Affidavit filed herewith. Based on these calculations, Grantley requests that the Court award Grantley prejudgment interest in the amount of $12,858,166 as of June 3, 2008.[6]

## III.     Grantley Should Be Granted Attorney Fees Pursuant to 35 U.S.C. § 285.

Grantley also moves that the Court declare this case "exceptional" within the meaning of 35 U.S.C. § 285, and award Grantley attorneys' fees and related expenses incurred to prevail at trial. Under 35 U.S.C. § 285, "The Court in exceptional cases may award reasonable attorney fees to the prevailing party." Attorney fees are awarded under section 285 to discourage infringement or to prevent gross injustice when the accused infringer has acted in bad faith. *See*

---

[5] Both Mr. Nawrocki & Mr. Mimms based their damages calculations on an infringing time period of July 1, 2003 through March 31, 2008. *See* Tr. at 685-86, 1521-22; DX190A & PX337b (Exhibits A & B hereto). The jury's verdict reflects that it found Clear Channel to be infringing during that time period, as their verdict was in line with Mr. Nawrocki's calculations, and thus July 1, 2003, is properly used as date of first infringement in calculating prejudgment interest. *See* Nawrocki Decl. ¶¶ 4-5 & Schedule 2.

[6] The foregoing number is based on a final judgment entry date of June 3, 2008. The appropriate amount of prejudgment interest depends on the exact date on which the Court enters judgment. For the Court's convenience, Mr. Nawrocki has also calculated a daily amount of interest due on the past damages awarded by the jury. For each day past June 3, 2008, before judgment is entered the amount should be increased by $11,253. *See* Nawrocki Affidavit filed herewith.

*Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1552 (Fed. Cir. 1989); *Kloster Speedsteel AB v. Crucible Inc.*, 793 F.2d 1565, 1580 (Fed. Cir. 1986) (a case may be deemed exceptional on a party's or its counsel's display of bad-faith during either the pre-trial or trial stages) (overruled on other grounds).   Expenses as well as attorney fees are appropriately awarded under 35 U.S.C. § 285.   *See, e.g., Beckman*, 892 F.2d at 1554 (holding fees and expenses for experts or consultants are clearly awardable under § 285); *SEB S.A. v. Montgomery Ward & Co.*, No. 99 Civ. 9284, 2007 WL 3165783, at *12 (S.D.N.Y. Oct. 9, 2007) ("plaintiff is entitled to reasonable expenses incurred by plaintiff's counsel during the prosecution of this case").

The jury found by clear and convincing evidence that Defendants willfully infringed Grantley's patents.  A finding of willful infringement is a factor to be considered in determining if a case is exceptional.   *See Del Mar Avionics, Inc. v. Quinton Instrument Co.*, 836 F.2d 1320, 1329 (Fed. Cir. 1987).   In fact, a finding of willfulness alone is sufficient basis for a case to be determined exceptional and for the Court to award attorney fees.  *Id.*; *Golight v. Wal-mart Stores, Inc.*, 355 F.3d 1327, 1340 (Fed. Cir. 2004) (quoting *Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc.*, 853 F.2d 1557, 1567 (Fed. Cir. 1988)).  Furthermore, "[d]istrict courts have tended to award attorney fees when willful infringement has been proven, and [the Federal Circuit] has uniformly upheld such awards."  *S.C. Johnson & Son, Inc. v. Carter-Wallace, Inc.*, 781 F.2d 198, 200 (Fed. Cir. 1986);  *see also Rohm & Haas Co. v. Crystal Chem. Co.*, 736 F.2d 688, 691 (Fed. Cir. 1984) ("[c]ases awarding attorney fees to prevailing patentees have typically found 'exceptional' circumstances in willful and deliberate infringement"); *Adv. Med. Optics, Inc. v. Alcon Labs, Inc.*, No. Civ.A. 03-1095-KAF, 2005 WL 3454283 (D. Del. Dec. 16, 2005) ("[a]n award of attorneys' fees and costs is typical in cases of willful infringement").  Moreover, the

Federal Circuit has in the past sought an explanation from a District Court when attorney fees are not awarded "in the face of [the jury's] express finding of willful infringement." *S.C. Johnson*, 781 F.2d at 201.

As discussed above in the analysis of the *Read* factors, there is significant evidence to support the jury's finding that Defendants willfully infringed and wantonly disregarded in bad faith the Grantley patents. The same factors discussed above that support enhanced damages also support awarding attorney fees. *See, e.g., Amsted Indus., Inc. v. Buckeye Steel Castings Co.*, 24 F.3d 178, 183-84 (Fed. Cir. 1994) (affirming district court's award of treble damages and attorney fees reached after review of *Read* factors).

Grantley submits, pursuant to Federal Rule of Civil Procedure 54(d)(2)(B)(iii), that the Court award $3,824,383.25 in attorney fees and $857,729.04 in expenses, for a total award of $4,682,112.29. As explained in detail in the Declaration of Ronald J. Schutz in support of the Motion for Entry of Judgment (filed herewith), the hours billed, the billing rates, and associated expenses are customary and commensurate with litigation of similar size and scope. Grantley is willing and able to provide any supplemental documentation regarding the fees or expenses in addition to those exhibited in the declaration as the Court requires. Grantley reserves the right to supplement or modify this request to include fees and expenses such as those incurred or invoiced after April 30, 2008.[7]

**IV.    The Law Also Mandates Post-judgment Interest.**

The judgment should also state that Grantley is entitled to post-judgment interest, setting forth the interest rate and date from which it runs. Post-judgment interest is mandatory under 28

---

[7] If Defendants intend to contest the appropriateness of the amount of attorney fees and expenses then they should be ordered to produce an accounting of their own attorney fees, expenses and costs for comparative purposes.

U.S.C. § 1961. *See, e.g., Olsen v. Teledyne Movable Offshore*, 708 F.2d 976, 984 (5th Cir. 1983). The statute calls for interest to "be calculated from the date of the entry of the judgment" and "computed daily to the date of payment" "at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment" and "compounded annually." 28 U.S.C. § 1961.

The plain language of 28 U.S.C. § 1961 makes no distinction between components of a judgment; it states that "[i]nterest shall be allowed on *any* money judgment in a civil case recovered in a district court." (emphasis added); *see also Fuchs v. Lifetime Doors, Inc.*, 939 F.2d 1275, 1280 (5th Cir. 1991) (directing district court to "award post-judgment interest on the entire amount of the final judgment, including damages, prejudgment interest, and attorney's fees") Thus, Grantley requests that the judgment recite that the total award, including the jury verdict and enhancements, prejudgment interest through the date of judgment, attorneys' fees and expenses, be subject to post-judgment interest computed as required by 28 U.S.C. § 1961.

### V.   Grantley Is Entitled to and Should Be Awarded A Reasonable Royalty for Ongoing Infringement.

Judgment in favor of Grantley should also include a reasonable ongoing royalty for future infringement. *See* Plaintiff's Post-Trial Motion and Brief in Support for an Ongoing Royalty for Clear Channel's Future Infringement filed herewith.

### CONCLUSION

Grantley is entitled to prejudgment and post-judgment interest, enhanced damages, attorney fees, expenses, costs and a royalty for ongoing infringement in this case. Judgment should be entered in favor of Grantley against Defendants jointly and severally in the amount of $210,947,416.00, which includes past damages in the amount of $66,029,750.00 awarded by the

jury, enhanced by $132,059,500.00 pursuant to 35 U.S.C. § 284, and prejudgment interest of $12,858,166.00. In addition, this case is exceptional and pursuant to 35 U.S.C. § 285 Defendants should pay Grantley's attorney fees and expenses, as well as costs pursuant to 35 U.S.C. § 284. The entire judgment should be subject to post-judgment interest under 28 U.S.C. § 1961. The Defendants should also pay a royalty to Grantley for the life of the patents.

Dated: May 12, 2008

**GERMER GERTZ, L.L.P.**

By /s/ Charles W. Goehringer, Jr.
    Charles W. Goehringer, Jr. (TX Bar # 00793817)
    e-mail: cwgoehringer@germer.com
    Lawrence Louis Germer (TX Bar # 07824000)
    e-mail: llgermer@germer.com
550 Fannin, Suite 400
P.O. Box 4915
Beaumont, Texas 77701
(409) 654-6700 – Telephone / (409) 835-2115–FAX

**ROBINS, KAPLAN, MILLER & CIRESI L.L.P.**
800 LaSalle Avenue, Suite 2800
Minneapolis, Minnesota 55402
(612) 349-8500 – Telephone / (612) 339-4181–FAX
    Emmett J. McMahon (MN Bar # 198298)
    Attorney in Charge
    e-mail: ejmcmahon@rkmc.com
    Ronald J. Schutz (MN Bar # 130849)
    e-mail: rjschutz@rkmc.com
    Cyrus A. Morton (MN Bar # 287325)
    e-mail: camorton@rkmc.com
    Brenda L. Joly (MN Bar # 0386791)
    e-mail: bljoly@rkmc.com
    Sarah Hudleston (MN Bar # 051489)
    e-mail: sehudleston@rkmc.com

**Attorneys for Plaintiff**
**GRANTLEY PATENT HOLDINGS, LTD.**

80078027.1

27

## CERTIFICATE OF SERVICE

I hereby certify that on May 12, 2008, I caused a true and correct copy of this document (Plaintiff's Post-Trial Motion and Brief in Support for Entry of Judgment Including Enhanced Damages, Interest, Attorney Fees, Expenses, and Costs) as well as the Declaration of Ronald J. Schutz in support of the Motion for Entry of Judgment and Affidavit of James J. Nawrocki filed herewith to be served on all counsel of record via Electronic Case Filing (ECF) pursuant to Local Rule CV-5(a).

Dated:  May 12, 2008                              /s/  Charles W. Goehringer, Jr.
                                                           Charles W. Goehringer, Jr.

## CERTIFICATE OF CONFERENCE

In accordance with Local Rule CV-7(h), Emmett McMahon, counsel for Grantley Patent Holdings, Ltd. met and conferred by telephone on May 7 and 8, 2008, with Jerry Beane, counsel for Defendants regarding this motion (Plaintiff's Post-Trial Motion for Entry of Judgment Including Enhanced Damages, Interest, Attorney Fees, Expenses, and Costs).  Defendants oppose the motion, and the parties agreed at the conclusion of the meeting that it would be necessary to proceed with said motion.

Dated: May 12, 2008                               /s/  Charles W. Goehringer, Jr.
                                                           Charles W. Goehringer, Jr.